Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

United States Courts
Southern District of Texas
FILED

JAN 1 2 2017

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| GUILLERMO CAPACHO, | § | 17 CR 019 |
|   a/k/a/ WILLIAM GOMEZ, | § | |
| MIGUEL GARCIA, & | § | |
| CESAR RIVERA | § | |

## INDICTMENT

The grand jury charges:

### COUNT ONE
### Conspiracy to Commit Mail and Wire Fraud
### (18 U.S.C. § 1349)

At all times material to this Indictment:

1.　　Company A was engaged in the business of providing drilling rig services to the energy industry. Company A was headquartered in Houston, Texas, and it did business in both the United States and Mexico.

2.　　Defendant GUILLERMO CAPACHO, also known as "WILLIAM GOMEZ," was a lawful permanent resident of the United States and a resident of The Woodlands, Texas. At all relevant times, CAPACHO served as the Senior Vice President of International Operations at Company A.

3. CAPACHO's spouse, hereinafter referred to as Co-Conspirator A, had access to a number of bank accounts titled in either her name or the names of others.

4. Defendant MIGUEL GARCIA was a Colombian citizen and business associate of defendant CAPACHO who resided in Windermere, Florida. GARCIA maintained control of multiple bank accounts, located in the United States and abroad, in the names of multiple corporations, including Servicios Colombianos Petroleros, Inc. (SCP), Servicios Colombianos Petroleros SAS Corporation (SCP SAS), and MGM & Company, Inc. (MGM).

5. Defendant CESAR RIVERA was a United States citizen and a resident of San Antonio, Texas. At all relevant times, RIVERA owned and operated a number of businesses that provided various services to the energy industry, and RIVERA's businesses operated in both the United States and Mexico. These included:

    a.    Gulf Coast Drilling S.A. de C.V. (Gulf Coast Drilling);

    b.    DiRivera Investment, LLC (DiRivera);

    c.    RGV Holding S.A. de C.V. (RGV);

    d.    Cegala del Noreste S.A. de C.V. (Cegala);

    e.    Cofiaga S.A. de C.V. (Cofiaga);

    f.    Cosafi del Noreste S.A. de C.V. (Cosafi); and

g.    Fino Oilfield Services, Inc. (Fino).

6.    With CAPACHO's assistance, RIVERA and his companies entered into a series of contracts with Company A.  Beginning in August 2011, CAPACHO helped RIVERA seek and win a lucrative contract to serve as the middleman in a large rig purchase deal.  This contract, which CAPACHO and other Company A employees referred to as "the Jose Project," called for RIVERA to buy 14 rigs from a competitor of Company A, then resell those rigs to Company A.  Company A eventually paid over $63,000,000 to RIVERA for the rigs.

7.    Beginning in approximately October 2012, CAPACHO helped RIVERA seek a second lucrative contract, known as "the Jose Lite" project.  This deal called for Company A to purchase additional rigs from companies owned by RIVERA, along with an option to purchase the companies themselves.  The "Jose Lite" project called for Company A to pay RIVERA $5,000,000 to purchase five rigs and the option to buy a RIVERA-controlled company.

8.    From in or about December 2011 through in or about February 2013, RIVERA kicked back over $4,000,000 to CAPACHO through a complex series of wire transfers.  These transfers involved sending money from accounts controlled by RIVERA, his mother, his employees, and their corporate entities to accounts controlled by GARCIA, Co-Conspirator A, and CAPACHO himself.

9.     Beginning no later than in or about May 2010, and continuing through at least in or about January 31, 2014, in the Houston Division of the Southern District of Texas and elsewhere, defendants

**GUILLERMO CAPACHO,
a/k/a WILLIAM GOMEZ,
MIGUEL GARCIA, &
CESAR RIVERA**

did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with others, including Co-Conspirator A, known and unknown, to commit offenses against the United States, that is, to devise and attempt to devise a scheme and artifice to defraud and obtain money and property from Company A and others by means of false and fraudulent pretenses, representations, and promises, and to defraud Company A of its right to its employee's honest services, and knowingly use the mails and interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

### Purpose of the Conspiracy

10.     The purpose and object of the conspiracy was for CAPACHO, GARCIA, RIVERA, and Co-Conspirator A to unjustly enrich themselves by obtaining money and property falsely and fraudulently from Company A and others in the form of artificially inflated contracts and concealed payments made

directly and indirectly to CAPACHO as kickbacks and bribes for helping RIVERA's companies win business from Company A.

## Manner and Means of the Conspiracy

11.    The co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

a.    CAPACHO caused and attempted to cause Company A to enter into lucrative contracts with companies owned and controlled by RIVERA, in connection with both regular drilling fluid contracts, "Project Jose," and the "Jose Lite" project.

b.    Pursuant to these contracts, CAPACHO and RIVERA caused Company A to pay RIVERA and companies he owned or controlled tens of millions of dollars, including the following "Jose project" payments:

1.    December 9, 2011: a $19,000,000 wire transfer from Company A to US Bank placing funds in escrow for the benefit of RIVERA, which funds were released to Dirivera Investments, LLC (Dirivera), a RIVERA-controlled company, on January 12, 2012;

2.    December 27, 2011: a $2,700,000 wire transfer from Company A to Dirivera's Lone Star Bank account (-3286);

3. January 9, 2012: a $4,800,000 wire transfer from Company A to Dirivera's Lone Star Bank account (-3286);

4. January 31, 2012: a $23,448,377.00 wire transfer from Company A to Dirivera's Lone Star Bank account (-3286); and

5. March 1, 2012: a $13,486,45.00 wire transfer from Company A to Dirivera's Lone Star Bank account (-3286).

c. RIVERA paid kickbacks to CAPACHO out of the contract fees he received from Company A.

d. CAPACHO and RIVERA concealed from Company A their relationship, including the kickbacks paid to CAPACHO by RIVERA, in a number of different ways, including:

1. Causing the kickbacks to be routed through shell corporations and bank accounts controlled by GARCIA, CAPACHO, Co-Conspirator A, and employees of RIVERA;

2. Causing the kickbacks to be routed through foreign bank accounts, including accounts in Canada, Mexico, Panama, and Colombia;

3. Communicating using private email accounts and alias names and nicknames, including "WILLIAM GOMEZ" and "Engineer" for CAPACHO, to discuss the details of the kickback scheme; and

6

4.    Concocting multiple false explanations for the large wire transfers from accounts controlled by RIVERA, in order to evade scrutiny from financial institutions.

## Overt Acts

12.    In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a.    On or about May 20, 2010, RIVERA, using the email address cesarriveraz@hotmail.com, sent an email to CAPACHO at his Company A account. In the email, RIVERA wrote: "The transaction happened today . . . . I'd like to see if you can help me out with more work . . . ."

b.    On or about October 21, 2010, Co-Conspirator A emailed CAPACHO a list of dates of prior payments from RIVERA to CAPACHO; CAPACHO forwarded the email to RIVERA and added that RIVERA still owed "4 of 25k." RIVERA replied the same day, "Ok Guillermo. I agree."

c.    On or about November 8, 2010, RIVERA emailed CAPACHO, saying that he was going to send CAPACHO $25,000 and asking: "Support me with work."

d.    On or about August 16, 2011, CAPACHO emailed RIVERA and asked "Can I call you? It's urgent." RIVERA replied, "Yes, call me."

e.    On or about August 19, 2011, RIVERA emailed CAPACHO at his Company A account in English (unlike the majority of their emails, which were in Spanish), formally introducing himself and asking for business, in an attempt to provide a false cover story for their relationship.

f.    Beginning in or about October 2011, CAPACHO helped convince other executives at Company A to contract with RIVERA and his companies on the Jose Project. CAPACHO's assistance included oral advocacy of the project and of RIVERA's involvement, drafting internal reports and presentations, and presenting the Jose Project to both the corporate officers and Board of Directors of Company A.

g.    On or about December 9, 2011, RIVERA signed the contract documents for the Jose Project on behalf of his companies. These documents called for RIVERA to purchase the rigs from Company A's competitor for over $30,000,000 and for RIVERA's companies to then sell the rigs to Company A for over $50,000,000. These prices eventually grew to over $37,000,000 for the purchase and over $63,000,000 for the resale to Company A. Notably, CAPACHO helped persuade Company A executives to provide, or "front," a substantial portion of the purchase price to RIVERA in advance, so that RIVERA did not use his own money to purchase the rigs.

h.      On or about December 14, 2011, using Mexico-based bank accounts of corporations he controlled, RIVERA wired two $50,000 payments to SCP's Colombian bank account.

i.      On or about December 17, 2011, CAPACHO, using the "William Gomez" alias and the wacg_62@hotmail.com email address, emailed RIVERA and asked him to send information making the transfers look like a loan from RIVERA's companies to SCP.

j.      On or about December 20, 2011, CAPACHO emailed RIVERA that he had spoken with GARCIA and suggested the following false cover story for the wire transfers: "you [RIVERA] are helping me send some money I had invested in Venezuela in some land," and that CAPACHO was now moving the money to Colombia to invest.

k.      On or about December 21, 2011, RIVERA forwarded by email two signed SCP invoices to GARCIA, making it look as though SCP had performed work for RIVERA's companies, in order to conceal the real reason for the two $50,000 kickbacks.

l.      On or about February 17, 2012, RIVERA wired two $200,000 payments to a Colombia-based bank account controlled by Co-Conspirator A.

m.      On or about February 21, 2012, RIVERA wired $200,000 to the same Colombian account controlled by Co-Conspirator A.

9

n.  On or about February 22, 2012, RIVERA wired $400,000 to the same Colombian account controlled by Co-Conspirator A.

o.  Beginning on or about February 23, 2012, RIVERA and CAPACHO discussed cover stories for these wire transfers. CAPACHO initially proposed a false contract stating that the money was repayment of an investment by CAPACHO that had appreciated. RIVERA replied: "The simplest way is for the rest to be deposited in a company. Do you have a company in Colombia? Or, handle it like a loan to your wife to open a company with stocks to be used as guarantees." RIVERA repeated this request in a February 28, 2012 email: "Engineer, my attorney says that it's better managed as an advance for a service in Mexico or something like that."

p.  On or about February 28, 2012, RIVERA caused one of his employees to open an account at a Texas branch of JPMorgan Chase & Co. (Chase). RIVERA and the employee then mailed the debit cards linked to this account to Co-Conspirator A, at her address in The Woodlands, Texas, for her personal use.

q.  On or about February 29, 2012, RIVERA wire transferred $199,975 to the Chase account.

r.  On or about March 9, 2012, RIVERA wire transferred $199,980 to the Chase account.

s.      In or about March 2012, RIVERA and CAPACHO devised another cover story for the wire transactions. RIVERA caused the creation of a sham investment contract, which falsely stated that one of his employees was buying a 30% stake in two companies owned by Co-Conspirator A. This contract justified the wire transfers to CAPACHO and his wife as payments for the equity interest in these companies. In reality, RIVERA owned the companies. Both Co-Conspirator A and RIVERA's employee signed the contract on or about March 10, 2012.

t.      On or about March 29, 2012, RIVERA wire transferred $200,000 to account controlled by CAPACHO at a Canadian bank.

u.      On or about June 2, 2012, GARCIA emailed RIVERA with wiring instructions, including the account and routing number, for a JPMorganChase account controlled by SCP and based in Windermere, Florida.

v.      On or about the dates listed below, RIVERA wire transferred the additional funds listed below from Fino Oilfield Services to the GARCIA-controlled SCP account for CAPACHO's benefit:

| DATE | AMOUNT |
|------|--------|
| 1 October 2012 | $50,000 |
| 20 November 2012 | $50,000 |
| 5 December 2012 | $201,327 |
| 6 December 2012 | $299,241 |
| 20 February 2013 | $250,000 |
| 21 February 2013 | $100,000 |

| 27 February 2013 | $50,000 |
|---|---|

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO – TWENTY-SIX
### Wire Fraud
### (18 U.S.C. §§ 1343, 2)

13.    Paragraphs One through Nine and Twelve are re-alleged as if incorporated herein.

14.    Beginning in at least March 2010 and the exact date being unknown, and continuing through in or about January 31, 2014, the defendants

**GUILLERMO CAPACHO,
a/k/a WILLIAM GOMEZ,
MIGUEL GARCIA, &
CESAR RIVERA**

aided and abetted by each other, did knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by false and fraudulent pretenses, representations and promises.

### Purpose of the Conspiracy

15.    Paragraph Ten is re-alleged as if incorporated herein.

### Manner and Means of the Scheme

16.    Paragraph Eleven is re-alleged as if incorporated herein.

### Execution of the Scheme

17.    On or about the dates listed below, in the Houston Division of the Southern District of Texas, and elsewhere, for the purpose of executing the scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and intending to do so, defendants CAPACHO, GARCIA, and RIVERA knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce the electronic communications set forth in the Counts below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 2 | 1/24/2012 | Email from CAPACHO to a Company A employee approving the payment schedule to RIVERA and notifying the Company A Chief Financial Officer of an upcoming payment. |
| 3 | 1/29/2012 | Email from CAPACHO to a Company A employee approving a $23,448,377 wire transfer to RIVERA. |
| 4 | 1/31/2012 | $23,448,377 wire transfer from Company A to the Lone Star Bank account (-3286) of Dirivera Investments, LLC. |
| 5 | 02/17/2012 | $200,000 wire transfer from Cegala's Banco Santander account (-4299) to Co-Conspirator A's Banco Davivienda account (-8206). |
| 6 | 02/17/2012 | $200,000 wire transfer from Cofiaga's Banco Santander account (-4285) to Co-Conspirator A's Banco Davivienda account (-8206). |
| 7 | 02/21/2012 | $200,000 wire transfer from Cegala's Banco Santander account (-4299) to Co-Conspirator A's Banco Davivienda account (-8206). |

| 8 | 02/22/2012 | $399,975 wire transfer from Cofiaga's Banco Santander account (-4285) to Co-Conspirator A's Banco Davivienda account (-8206). |
|---|---|---|
| 9 | 02/23/2012 | Email from CAPACHO to RIVERA proposing a false cover story to explain the wire transfers. |
| 10 | 02/29/2012 | $199,975 wire transfer from Cegala's Banco Santander account (-4285) to CAPACHO's nominee account at JPMorgan Chase (-0553) |
| 11 | 03/02/2012 | $13,486,645 wire transfer from Company A to Dirivera Investments, LLC's Lone Star Bank account (-3286) |
| 12 | 03/09/2012 | $199,980 wire transfer from Cegala's Banco Santander account (-4299) to CAPACHO's nominee account at JPMorganChase (-0553) |
| 13 | 03/10/2012 | Email from RIVERA employee to CAPACHO attaching fraudulent contract purporting to sell interest in Cegala and Cofiaga held by RIVERA to employee of RIVERA's brother. |
| 14 | 03/26/2012 | Email from Co-Conspirator A to RIVERA requesting a $200,000 wire transfer into a Canadian bank account and attaching the account information. |
| 15 | 03/29/2012 | $200,000 wire transfer from Cegala's Banco Santander account the HSBC Canada account (-9070) of Serdniloc Corporation, Inc., in order to help fund CAPACHO's purchase of a home in Colombia. |
| 16 | 05/16/2012 | $180,000 wire transfer from RGV Holding S.A. de C.V.'s Lone Star National Bank account (-1233) to |

| | | MGM & Co., Inc.'s Bank of America account (-9593) |
|---|---|---|
| 17 | 06/01/2012 | Email from RIVERA to CAPACHO asking for GARCIA to "send me an invoice to support the transaction" and suggesting: "It should be for engineering services for 200,000 usd [sic]." |
| 18 | 06/02/2012 | Email from GARCIA to RIVERA and RIVERA attaching a false $200,000 SCP invoice and information for a SCP SAS Corp. Chase bank account in Florida (-6744). |
| 19 | 08/27/2012 | Email from GARCIA to RIVERA attaching two false SCP SAS Corp. invoices and requesting corresponding wire transfers into the SCP SAS Corp. Chase account (-6744). |
| 20 | 10/01/2012 | $50,000 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Chase account (-6744). |
| 21 | 11/20/2012 | $50,000 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |
| 22 | 12/05/2012 | $201,327 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |
| 23 | 12/06/2012 | $299,241 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |
| 24 | 02/20/2013 | $250,000 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |

| 25 | 02/21/2013 | $100,000 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |
| --- | --- | --- |
| 26 | 02/27/2013 | $50,000 wire transfer from Fino Oilfield Services, Inc. Chase account (-2528) to SCP SAS Corp Wells Fargo account (-8992). |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TWENTY-SEVEN
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

18.    Paragraphs 1 through 8 and 10 through 12 are re-alleged and incorporated by reference as though fully set forth herein.

19.    From in or around 2009, and continuing through at least April 7, 2014, in the Southern District of Texas and elsewhere, the defendants,

**GUILLERMO CAPACHO,**
**a/k/a/ WILLIAM GOMEZ,**
**MIGUEL GARCIA, &**
**CESAR RIVERA**

did knowingly conspire, confederate, and agree with each other and others known and unknown to the United States, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a. knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, knowingly to conduct or attempt to conduct such a financial transaction which in fact represented

16

the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

b. to engage knowingly in a monetary transaction by, through and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1957.

## **Manner and Means of the Conspiracy**

20. The manner and means by which CAPACHO, GARCIA, RIVERA, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

a.    CAPACHO, together with others, helped RIVERA win contracts from Company A in exchange for bribes and kickbacks.

b.    RIVERA, together with others, caused bank accounts to be opened in the name of his employees so that funds could be secretly provided to CAPACHO and his wife.

c.    CAPACHO, RIVERA, GARCIA, and Co-Conspirator A, together with others, engaged in monetary transactions among their various companies designed to conceal the nature, source, and ownership of the proceeds of the specified unlawful activity.

d.    CAPACHO, RIVERA, GARCIA, and Co-Conspirator A, together with others, created false justifications for the bribes and kickbacks, including invoices for services that were never performed, for the purpose of concealing and disguising the nature, source, and ownership of those payments.

e.    CAPACHO and Co-Conspirator A, together with others, engaged in monetary transactions of a value greater than $10,000 using money procured through the fraudulent scheme.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWENTY-EIGHT – THIRTY-SEVEN
### (Money Laundering – 18 U.S.C. § 1956)

21.     Paragraphs 1 through 8 and 10 through 12 are re-alleged and incorporated by reference as though fully set forth herein.

22.     On or about the dates set forth below, defendants

**GUILLERMO CAPACHO,**
**a/k/a/ WILLIAM GOMEZ,**
**MIGUEL GARCIA, &**
**CESAR RIVERA,**

aided and abetted by each other and others known and unknown, and knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct and cause to be conducted such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(1)(B), as described below:

| COUNT | DATE | DEFENDANT(S) CHARGED | FINANCIAL TRANSACTION |
|-------|------|----------------------|------------------------|
| **28** | 02/17/12 | **RIVERA** | $500,000 wire transfer from RGV's Lone Star Bank account (-1233) to Cegala's Banco |

| | | | |
|---|---|---|---|
| | | | Santander account (-4299) |
| **29** | 02/17/12 | **RIVERA** | $700,000 wire transfer from RGV's Lone Star Bank account (-1233) to Cofiaga's Banco Santander account (-4285) |
| **30** | 08/21/2012 | **CAPACHO** | Sterling Dale house down payment funded with $798,758.15 cashier's check from CAPACHO's Chase account (-1017) |
| **31** | 01/25/13 | **CAPACHO & GARCIA** | $375,000 wire transfer from SCP SAS (-8992) to CAPACHO's BancFirst account (-5858) |
| **32** | 01/25/13 | **CAPACHO & GARCIA** | $373,563.10 wire transfer from CAPACHO's BancFirst account (-5858) to MRC's Bank of America account (-9173) to pay off home mortgage on Player Oaks house |
| **33** | 04/07/14 | **CAPACHO** | $140,000 check issued by Co-Conspirator A from the Chase account (-0116) and deposited in "New York's 529 Advisor-Guided College Saving Program" (-7801) |

| | | | |
|---|---|---|---|
| **34** | 10/03/12 | **CAPACHO & GARCIA** | $55,000 check issued by GARCIA from SCP SAS's Chase account (-6744) and deposited by Co-Conspirator A |
| **35** | 02/20/13 | **CAPACHO & GARCIA** | $80,000 wire transfer from SCP SAS's Wells Fargo account (-8992) to the Chase account (-2702) of Co-Conspirator A |
| **36** | 05/14/12 | **CAPACHO & GARCIA** | $117,000 check issued by GARCIA from MGM & Co.'s Bank of America account (-7253) to "Pablo A. Garcia" and deposited by Pablo Garcia. |
| **37** | 05/17/12 | **CAPACHO & GARCIA** | $180,000 wire transfer issued by GARCIA from MGM & Co.'s Bank of America account (-7253) to "Diguidany" |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B).

## NOTICE OF FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants that in the event of conviction of any of the offenses charged in Counts One through Twenty-Six of this Indictment, all property, real or personal, which constitutes or is derived from proceeds traceable to such offense, is subject to forfeiture.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants that in the event of conviction of any of the offenses charged in Counts Twenty-Seven through Thirty-Seven of this Indictment, all property, real or personal, involved in the money laundering offenses or traceable to such property, is subject to forfeiture.

### Money Judgment

The defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, which is at least $3 million.

## Property Subject to Forfeiture

Defendant CAPACHO is notified that the property subject to forfeiture includes, but is not limited to, the real property, together with all improvements, buildings, structures and appurtenances, legally described as:

> Lot Eight (8), in Block Three (3), of THE WOODLANDS, VILLAGE OF STERLING RIDGE, SECTION TWENTY-THREE (23), a subdivision in Montgomery County, Texas, according to the map or plat thereof recorded in Cabinet S, Sheets 40 through 45 of the Map and/or Plat Records of Montgomery County, Texas.

## Substitute Assets

The defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of a defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture pursuant to Title 21, United States

Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original signature on File

FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON
UNITED STATES ATTORNEY

BY:

RALPH IMPERATO
JOHN P. PEARSON
ASSISTANT U.S. ATTORNEYS